**Paige N. LANCASTER, A Minor, by Barbara L. Lancaster, et al., Plaintiffs,**

v.

**KAISER FOUNDATION HEALTH PLAN OF MID–ATLANTIC STATES, INC., et al., Defendants.**

Civ. A. No. 97–122–A.

United States District Court, E.D. Virginia.

April 10, 1997.

Michael J. Miller, Patricia M. Spicer, Miller & Associates, Alexandria, VA, for Plaintiffs.

Anthony J. Trenga, Michael L. Zupan, Carla Blake Hook, Hazel and Thomas, P.C., Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiffs are a minor child and her mother who filed a state court action alleging: (i) medical malpractice against two primary-care physicians; (ii) vicarious liability and negligence against the Health Maintenance Organization (HMO) and the physicians' professional corporation; and (iii) fraud against

all defendants. Defendants promptly removed the action to federal court, arguing that plaintiffs' state law claims triggered the "complete preemption" exception to the "well-pleaded complaint rule." *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). The matter is now before the Court on plaintiffs' motion to remand and defendants' motion to dismiss all claims on preemption grounds. Central to the disposition of these motions is the question whether plaintiffs' claims are preempted by the federal Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq. Put another way, the question to be resolved here is whether the complaint is, as defendants see it, merely an ERISA claim for denial of benefits masquerading as a medical malpractice action, or, as plaintiffs see it, simply a state malpractice, negligence, and fraud action that defendants cannot dress up as ERISA claims.

## I [1]

Plaintiff, Barbara L. Lancaster, filed this action both individually and on behalf of her daughter, Paige N. Lancaster ("Lancaster"). Both are Virginia citizens.

Defendant, Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc. ("Kaiser"), is an HMO licensed to provide health care services in the Commonwealth of Virginia.[2] Defendant, Mid–Atlantic Permanente Medical Group, P.C. ("Medical Group"), is a professional corporation of physicians that contracts with Kaiser to provide medical services to Kaiser members at Kaiser-owned clinics.[3] Defendants, Corder C. Campbell ("Campbell") and L. Pauls ("Pauls"), are Virginia citizens licensed to practice medicine in Virginia and, at all relevant times, were employed by the Medical Group. Lancaster's membership in Kaiser was paid for by an ERISA plan sponsored by her father's employer, Star Enterprises.[4]

The essential facts, as set forth in the complaint, are easily summarized. On September 3, 1991, Lancaster, then eleven years old, visited Kaiser's clinic in Woodbridge, Virginia, complaining of nausea and severe, daily headaches on the right side of her head. Campbell examined Lancaster, treated her as a pediatric patient, but did not pursue

---

1. For the purpose of deciding defendants' motion to dismiss Count II under Rule 12(b)(6), Fed. R.Civ.P., the operative facts as alleged by plaintiff, the non-moving party, must be accepted as true. *See Estate Const. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 217–18 (4th Cir. 1994); *Martin Marietta Corp. v. International Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir.1992).

2. Typically, HMOs, like Kaiser, perform two independent functions, namely that of health care insurer and that of medical services provider. In essence, an HMO enrollee pays a premium in exchange for a complete menu of basic and supplemental medical services at little or no additional out-of-pocket expense. *See generally* Comment, Seema R. Shah, *Loosening ERISA's Grip on HMO Medical Malpractice Claims: A Response to Pacificare of Oklahoma v. Burrage*, 80 MINN. L. REV. 1545, 1548–49 (1996); Note, Deven C. McGraw, *Financial Incentives to Limit Services: Should Physicians Be Required To Disclose These To Patients?*, 83 GEO. L.J. 1821, 1821 (1995).

3. HMOs generally adhere to one of three distinct management models: (i) group; (ii) staff; and (iii) individual practice association (IPA). *See generally* Note, L. Frank Coan, Jr., *You Can't Get There From Here—Questioning the Erosion of*

*Erisa Preemption in Medical Malpractice Actions Against HMOs*, 30 GA. L. REV. 1023, 1027 (1996); Note, Kenneth R. Pedroza, *Cutting Fat or Cutting Corners, Health Care Delivery and Its Respondent Effects on Liability*, 38 ARIZ. L.REV. 399, 408 (1996). Under the staff model, the HMO employs the physicians and owns the health care facility. In the IPA model, the HMO contracts with a partnership or corporation of physicians to provide medical services for members on a reduced fee-for-service basis. And, pursuant to the group model, the HMO contracts with an independent group of physicians to work in an HMO owned and operated facility. Some HMOs fashion a hybrid structure incorporating features of each of these models.

In the instant action, Kaiser operates under the group model. It provides health care services to its members through the Medical Group pursuant to a contractual arrangement. The Medical Group hires and employs its own physicians, but Kaiser provides the Medical Group with facilities, equipment, and supplies.

4. Lancaster's father, John R. Lancaster, is contractually obligated to provide his children health care benefits according to the terms and conditions of the property settlement agreement entered into as a part of his 1984 divorce from Barbara Lancaster.

further diagnostic testing. From 1991 through 1995, Lancaster repeatedly returned to Kaiser's clinic in Woodbridge for further treatment by Campbell and Pauls of her recurring headaches. Throughout the course of this treatment, Campbell and Pauls prescribed adult strength narcotic pain medication, but never consulted with a neurological specialist. At no time did Campbell and Pauls ever recommend an MRI, CAT scan, EEG, or any other diagnostic test to assess Lancaster's condition.

In May 1996, the school psychologist at Lancaster's high school became concerned about Lancaster's deteriorating academic performance and wrote Campbell and Pauls urging them to perform diagnostic testing to determine the cause and origin of Lancaster's intense, localized headaches, vomiting, and blood-shot eyes. Thereafter, on May 13, 1996, roughly four and one-half years after Lancaster's initial visit to Kaiser's Woodbridge clinic, Campbell and Pauls recommended that Lancaster undergo both an EEG and MRI. Sadly, the MRI, performed on May 23, 1996, revealed a right frontal tumor and cystic mass that had infiltrated over forty percent of Lancaster's brain. Soon thereafter, on May 31, 1996, Lancaster underwent surgery at Georgetown University Medical Center to remove the tumor. Yet, because of the tumor's large size and maturity, the surgery was not entirely successful. So, two months later, Lancaster returned to Georgetown Hospital for a second operation to remove the remainder of the tumor and cystic mass. This surgery was also not completely successful and, as a consequence, Lancaster has since undergone additional brain surgery, as well as radiation therapy. And it further appears from the complaint's allegations that Lancaster will require future surgery and continuing intensive care as a result of her serious medical condition.

According to the complaint, throughout the nearly five year period Campbell and Pauls treated Lancaster, Kaiser and the Medical Group had in place a financial incentive program ("Incentive Program") whereby physicians receive bonuses for avoiding excessive treatments and tests.[5] Consistent with an HMO's goal of containing health care costs, the Incentive Program is ostensibly designed to encourage physicians to refrain from prescribing unnecessary and costly medical procedures and tests.[6] Plaintiffs dispute that the Incentive Program operates as designed, arguing that in fact the program affects the quality of care provided by encouraging physicians to make treatment decisions on other than medical grounds. Thus, plaintiffs label the program a "disincentive program." In any event, the existence of the Incentive Program, which purportedly paid monetary bonuses to Campbell, Pauls, and other Kaiser physicians, is pivotal to the motions at bar.

On December 30, 1996, plaintiffs filed a five count complaint in the Circuit Court of Prince William County, Virginia, which, distilled to its essence, may be briefly summarized as follows:

(i) Count I (negligence) alleges that Campbell "deviated from the accepted standard of medical care" because, among other things, he "failed to create an appropriate and timely differential diagnosis; failed to timely and properly refer the [patient] to a neurologist; fail[ed] to properly and timely order an MRI, CT Scan, EEG and/or other

---

**5.** At oral argument, defendants challenged the accuracy of plaintiffs' description of the Incentive Program, not its existence. While the parties apparently dispute the exact content and effect of this program, that dispute is immaterial at this stage, as the complaint's allegations must be accepted as true for the limited purpose of disposing of the motions at bar. *See supra* note 1.

**6.** For a critical assessment of this type of cost containment strategy, see generally MARC A. RODWIN, MEDICINE, MONEY AND MORALS 140 (1993); Alan L. Hillman, et al., *How Do Financial Incentives Affect Physicians' Clinical Decisions and the Financial Performance of Health Maintenance Organizations?*, 321 NEW ENG. J. MED. 86, 86 (1989).

A more common HMO cost containment strategy is the so-called "utilization review," whereby an enrollee is required to obtain "pre-certification" prior to his or her receipt of medical care. *See generally* Note, Jonathan J. Frankel, *Medical Malpractice Law and Health Care Cost Containment: Lessons for Reformers from the Clash of Cultures*, 103 YALE L.J. 1297, 1302 (1994); John O. Blum, *An Analysis of Legal Liability in Health Care Utilization Review and Case Management*, 26 HOUS. L.REV. 191, 192–93 (1989).

diagnostic testing; ... fail[ed] to timely respond to his patient['s] signs and symptoms of a growing brain tumor; and fail[ed] to prescribe and use appropriate drugs in the appropriate dosages of said drugs to treat his patient."

(ii) Count II (negligence) alleges that Pauls breached his duty to act as a reasonably prudent medical practitioner in the same manner and to the same extent as Campbell.[7]

(iii) Count III (negligence) alleges that Kaiser "is [indirectly] liable [by virtue of] *respondeat superior* for the negligence of Campbell and Pauls" and directly liable "for the establishment of guidelines and cost standards which worked against the full and prompt diagnostic assessment [of Lancaster's brain tumor] within the accepted standard of care and for its failure to establish policies, protocols, guidelines and standards for an adequate diagnostic assessment and treatment of [Lancaster's] continuing headaches."

(iv) Count IV (negligence) alleges that the Medical Group "is liable for the negligence [of Campbell and Pauls by virtue of] *respondeat superior* " and "is further negligent for the establishment of guidelines and cost standards which work[ed] against [Lancaster] receiving a proper diagnosis and treatment assessment within the standard of care during the course of her treatment for her headaches and for the failure to establish policies, protocols, guidelines and standards for her diagnostic assessment during her hospitalization."

(v) Count V (actual and constructive fraud) alleges that each defendant "made an actual misrepresentation of a material fact knowingly and intentionally ... with the intent to mislead ... Barbara Lancaster...." Specifically, defendants "represented that they would provide medical care within or exceeding the appropriate standard of care for reasonably prudent practitioners similarly situated ... [and then, despite] that representation, each defendant herein knowingly and intentionally established policies and guidelines which would financially benefit [Campbell and Pauls] for not providing care as reasonably prudent practitioners similarly situated and that bonuses and/or profit incentives were paid to these physicians for not rendering full and adequate care as needed."

On January 28, 1997, defendants removed this case to federal court pursuant to the "complete preemption" exception to the "well-pleaded complaint rule." *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Soon thereafter, defendants moved to dismiss under Rule 12(b)(6), Fed.R.Civ.P. Then, on February 11, 1997, plaintiffs moved to remand this action to state court pursuant to 28 U.S.C. § 1447(c). This Court heard oral argument, took the motions under advisement, and stayed all further proceedings pending resolution of the two motions. *Lancaster v. Kaiser Foundation Health Plan of the Mid-Atlantic States,* C.A. No. 97–122–A (Order, February 24, 1997). The matter is now ripe for disposition.

## II

Removal jurisdiction is the threshold question. If removal was improper, there is no federal jurisdiction and the matter must be promptly remanded to state court without consideration of the pending motion to dismiss. On the other hand, if removal was proper, there is jurisdiction to proceed to consider defendants' motion to dismiss.

The parties' contentions properly frame the issues presented. In their remand motion, plaintiffs contend that removal was improper and that this action should be remanded because their "well-pleaded complaint" alleged solely state common law claims of medical malpractice, vicarious liability, negligence, and fraud. According to plaintiffs, the absence of removal jurisdiction precludes this Court from considering defendants' motion to dismiss on the basis of ERISA preemption under § 514(a), 29

---

7. Counts I and II also allege, without elaboration, that Campbell and Pauls failed to disclose the existence of the Incentive Program to Lancaster's mother. While this allegation is the gravamen of Count V, the complaint does not explain what relevance, if any, these allegations have to the medical negligence claims in Counts I and II.

U.S.C. § 1144. In response, defendants contend that removal was proper in the circumstances because each of plaintiffs' five counts falls within the scope of ERISA's civil enforcement scheme, § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), thereby triggering the "complete preemption exception" to the "well-pleaded complaint rule." As a consequence, defendants contend that there is removal jurisdiction in the circumstances and that this Court should proceed to consider the merits of the motion to dismiss plaintiffs' state claims as preempted by ERISA.

The jurisdictional principles governing removal are well-established. The threshold requirement is that the complaint must fall within the "original jurisdiction" of the federal district court. 28 U.S.C. § 1441(a).[8] In other words, an action may be removed to

federal court only if it might have been filed there originally.[9] So, where, as here, there is no diversity of citizenship between the parties, the propriety of removal depends on the existence of federal question jurisdiction, i.e., whether any of plaintiffs' claims "arise under" federal law.[10] 28 U.S.C. § 1331.

Whether any of plaintiffs' claims "arise under" federal law is determined by application of the "well-pleaded complaint rule." According to the Supreme Court, "[i]t is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." Taylor, 481 U.S. at 63, 107 S.Ct. at 1546.[11] Under the "well-pleaded complaint rule," a civil action "arises under" federal law when a federal question appears on the face of plaintiff's properly-pleaded complaint.[12]

---

8. 28 U.S.C. § 1441(a) provides, in pertinent part, that:

Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending.

9. See Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987) ("Only state-court actions that originally could have been filed in federal court may be removed to federal court by the defendant."); Franchise Tax Bd. of State Of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 7–8, 103 S.Ct. 2841, 2845, 77 L.Ed.2d 420 (1983) ("With exceptions not relevant here, 'any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the United States for the district and division embracing the place where such action is pending'.") (citation omitted); Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers, 390 U.S. 557, 560, 88 S.Ct. 1235, 1237, 20 L.Ed.2d 126 (1968) ("It ... seems clear that this suit is within the 'original jurisdiction' of the District Court within the meaning of 28 U.S.C. §§ 1441(a) and (b).").

10. See Franchise Tax Bd., 463 U.S. at 8, 103 S.Ct. at 2845 ("For this case—as for many cases where there is no diversity of citizenship between the parties—the propriety of removal turns on whether the case falls within the original 'federal question' jurisdiction of the United States district courts."); Cummings v. City of Chicago, 188 U.S. 410, 425–26, 23 S.Ct. 472, 475, 47 L.Ed. 525 (1903) ("That the parties, plaintiffs and defen-

dant, are citizens of the same state is not sufficient to defeat the jurisdiction; for by act of March 3d, 1887 ..., the circuit courts have jurisdiction, without reference to the citizenship of the parties, of suits at common law or equity arising under the Constitution or laws of the United States.").

11. See also Jass v. Prudential Health Care Plan, Inc., 88 F.3d 1482, 1486 (7th Cir.1996) (holding that "naturally courts begin with a review of the [plaintiff's] complaint"); Childers v. Chesapeake & Potomac Tel. Co., 881 F.2d 1259, 1261 (4th Cir.1989) (finding that federal question jurisdiction must be determined by examining plaintiff's complaint); Broadnax Mills, Inc. v. Blue Cross & Blue Shield of Va., 867 F.Supp. 398, 400 (E.D.Va. 1994) (stating that "original jurisdiction exists where the plaintiff's [complaint contains a] cause of action aris[ing] under the Constitution or federal law").

12. See Franchise Tax Bd., 463 U.S. at 10, 103 S.Ct. at 2847 ("For better or worse, under the present statutory scheme as it has existed since 1887, a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case 'arises under' federal law."); Taylor v. Anderson, 234 U.S. 74, 75–6, 34 S.Ct. 724, 724–25, 58 L.Ed. 1218 (1914) (" [W]hether a case is one arising under the Constitution or a law or treaty of the United States, in the sense of the jurisdictional statute, ... must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration.... "). See also Childers, 881 F.2d at 1261 ("Federal jurisdiction exists, ..., 'only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.' ") (citation omitted).

Put another way, a defendant cannot convert a plaintiff's state claim into a federal question solely on the basis of an asserted federal defense.[13] Even the defense of preemption is insufficient to permit removal to federal court.[14] In other words, "[t]he [well-pleaded complaint] rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law."[15]

■ Yet, there is an exception, "or corollary," to the "well-pleaded complaint rule." Recognizing that the rule, untempered, might inappropriately close federal courthouse doors to cases that merit removal, the Supreme Court created the doctrine of "complete preemption," which permits removal of an otherwise non-federal action if the asserted state claims conflict with a federal statutory scheme.[16] Put another way, complete preemption occurs whenever "Congress [ ] so completely pre-empts a particular area [of law] that any civil complaint raising this select group of claims is necessarily federal in character."[17] In that event, "the preemptive force of [the federal statute] is so powerful as to displace entirely any state cause of action [addressed by the federal law]."[18] Nor is there any doubt that complete preemption applies to ERISA; although the doctrine of complete preemption originated in the context of § 301 of the Labor Management Relations Act, the Supreme Court has extended it to ERISA.[19] In the ERISA context, the Supreme Court determined that the complete preemption doctrine supports removal of state causes of action that fit within the scope of ERISA's civil enforcement provision, § 502(a)(1)(B), which authorizes action by a participant or beneficiary to recover benefits or to enforce or clarify rights under the terms of a health plan.[20]

13. *See Caterpillar Inc.*, 482 U.S. at 393, 107 S.Ct. at 2430 ("[I]t is now settled law that a case may not be removed to federal court on the basis of a federal defense...."); *Gully v. First Nat'l Bank*, 299 U.S. 109, 113, 57 S.Ct. 96, 97–8, 81 L.Ed. 70 (1936) ("A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto, and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal.") (citation omitted).

14. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987) ("Federal pre-emption is ordinarily a federal defense to the plaintiff's suit. As a defense, it does not appear on the face of a well-pleaded complaint, and, therefore, does not authorize removal to federal court."); *Franchise Tax Bd.*, 463 U.S. at 14, 103 S.Ct. at 2848 ("[I]t has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case.").

15. *Caterpillar Inc.*, 482 U.S. at 392, 107 S.Ct. at 2429 (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913)) ("Of course, the party who brings a suit is master to decide what law he will rely upon").

16. The Supreme Court first announced the doctrine of complete preemption in *Avco Corp.*, 390 U.S. at 560, 88 S.Ct. at 1237. There, "the Supreme court held that state law claims within the scope of § 301 of the Labor Management Rela-

tions Act were removable to federal court." *Jass*, 88 F.3d at 1486.

17. *Taylor*, 481 U.S. at 63–64, 107 S.Ct. at 1546–47; *see also Caterpillar Inc.*, 482 U.S. at 393, 107 S.Ct. at 2430 ("Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law."); *Franchise Tax Bd.*, 463 U.S. at 23–4, 103 S.Ct. at 2854 ("*Avco* stands for the proposition that if a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law."); *Custer v. Sweeney*, 89 F.3d 1156, 1165 (4th Cir.1996) ("Only when the federal statute's preemptive scope is sufficiently broad to reach a purported state law claim and its preemptive force is sufficiently powerful to convert that particular claim into a federal claim will the complete preemption doctrine apply.").

18. *Franchise Tax Bd.*, 463 U.S. at 23, 103 S.Ct. at 2853.

19. *Franchise Tax Bd.*, 463 U.S. at 24, 103 S.Ct. at 2854; *Taylor*, 481 U.S. at 64, 66, 107 S.Ct. at 1546–47, 1547–48.

20. More specifically, § 502(a) provides, in pertinent part, that:

A civil action may be brought—
(1) by a participant or beneficiary—
(A) for the relief provided for in subsection (c) of this section, or

It is important to recognize that the jurisdictional doctrine of complete preemption differs from the federal defense of ERISA preemption.[21] Only the former, not the latter, is a basis for removal. The ERISA preemption defense stems from the ERISA preemption clause, § 514(a), which provides that, with only a few exceptions, ERISA's provisions "supersede any and all State common laws insofar as they may now or hereafter relate to any employee benefit plan."[22] Although the ERISA preemption clause has been broadly construed,[23] the fact that a plaintiff's state claims may be preempted because they "relate to" an ERISA plan under § 514 does not necessarily mean that they also fit within the scope of ERISA's civil enforcement provision, § 502. Put another way, every state claim completely preempted by § 502 is, *a fortiori*, related to ERISA, but not every state claim related to ERISA under § 514 is completely preempted.[24] In other words, because § 502 is narrower than § 514, complete preemption, which turns on the scope of § 502, is narrower than § 514 preemption. In the final analysis, then, "when the doctrine of complete preemption does not apply, but the plaintiff's state claim is arguably preempted under § 514(a), the district court, being without removal jurisdiction, cannot resolve the dispute regarding [ERISA] preemption."[25] This task falls to the state court on remand.

The dichotomy between complete preemption and ERISA preemption is well illustrated by the Third Circuit's holding in *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350 (3d Cir.1995), which blazed precisely the analytical trail followed here. In that case, which involved two consolidated appeals, plaintiffs alleged that the defendant HMO, U.S. Healthcare, Inc., was vicariously liable for the negligence of the plan's medical service providers as well as directly negligent for failing to select, monitor, and evaluate its personnel. The HMO removed both cases to federal court on the ground that plaintiffs received their medical care as a "benefit" of their respective ERISA plans and, thus, their claims were completely preempted. The district courts denied each plaintiff's separate motion to remand and, in turn,

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

21. In recent years, federal courts have begun to recognize and explore the contrast between complete preemption and ERISA preemption. *See, e.g., Jass,* 88 F.3d at 1487 (explaining the difference between complete preemption and ERISA preemption); *Warner v. Ford Motor Co.,* 46 F.3d 531, 535 (6th Cir.1995) (finding that "[r]emoval and preemption are two distinct concepts"); *Rice v. Panchal,* 65 F.3d 637, 640 (7th Cir.1995) ("The difference in language between §§ 502(a) and 514(a) underscores the significant difference in the scope of the two sections."); *Lupo v. Human Affairs Int'l, Inc.,* 28 F.3d 269, 272–73 (2d Cir.1994) (reversing a district court's dismissal of plaintiff's state law professional malpractice claim on the basis of ERISA preemption because the cause of action did not satisfy the complete preemption doctrine).

22. Section 514, in full, provides that:
Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter II of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

23. Cases recognizing the expansive breadth of ERISA preemption are legion. *See, e.g., New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655–56, 115 S.Ct. 1671, 1677, 131 L.Ed.2d 695 (1995) ("The governing text of ERISA [preemption] is clearly expansive."); *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990) ("Where, as here, Congress has expressly included a broadly worded pre-emption provision in a comprehensive statute such as ERISA, our task of discerning congressional intent is considerably simplified."); *FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990) ("The pre-emption clause is conspicuous for its breadth."); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45–6, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) ("We have observed in the past that the express pre-emption provisions of ERISA are deliberately expansive....").

24. *Dukes v. U.S. Healthcare, Inc.,* 57 F.3d 350, 354 (3d Cir.) ("That the Supreme Court has recognized a limited exception to the well-pleaded complaint rule for state law claims which fit within the scope of § 502 by no means implies that all claims preempted by [§ 514] of ERISA are subject to removal."), *cert. denied,* —— U.S. ——, 116 S.Ct. 564, 133 L.Ed.2d 489 (1995).

25. *Id.* at 355.

granted the HMO's motions to dismiss, finding that removal jurisdiction existed and both complaints "related to" an ERISA plan.

The Third Circuit reversed, holding that both district courts lacked removal jurisdiction and could not dismiss the actions as preempted by ERISA. In particular, the Third Circuit found that plaintiffs' state law claims fell outside § 502(a)(1)(B) because they focused on the "quality" of the medical benefits received, as opposed to the "quantity" of the medical benefits delivered. *Id.* at 356. To support its holding, the Third Circuit closely examined the text and purpose of ERISA and then noted that "[t]he statute simply says nothing about the quality of benefits received." *Id.* at 357. The *Dukes* panel opined that the outcome might have been different had plaintiffs claimed that the HMO had administratively withheld medical services to which they were entitled under their ERISA plans. *Id.* But that was not the case, as plaintiffs merely attacked the inferior quality of the benefits. *Id.*

■■■ In summary, then, there is complete preemption, and consequently removal jurisdiction, where an ERISA plan beneficiary or participant challenges the administrative denial of a medical benefit due under the plan, *i.e.*, where plaintiff's complaint assails the *quantity* of benefits received. But complete preemption, and hence removal jurisdiction, is absent where an ERISA plan beneficiary or participant challenges the soundness of a medical decision made during the course of treatment, *i.e.*, where plaintiff's complaint assails the *quality* of care provided under the plan. In other words, to assess the existence of complete preemption, federal courts must determine whether a plaintiff's state claim attacks an administrative decision to deny benefits to a plan participant or a medical decision to deny treatment to a patient. This distinction, while generally useful, must be used carefully, for it tends

to blur at the margins. As the *Dukes* panel recognized, an administrative decision to deny health care benefits or to restrict the quantity of such benefits may well have an adverse effect on the quality of care provided.[26]

### III

These principles, applied here, require an examination of each of plaintiffs' claims. If any one of the claims is completely preempted, then removal of the entire complaint is proper, regardless of whether the district court might have had original jurisdiction over the remaining claims. 28 U.S.C. 1441(c);[27] *Franchise Tax Bd.*, 463 U.S. at 13, 103 S.Ct. at 2848. The first task, then, is to analyze each of plaintiffs' five counts to determine if any fall within § 502(a)(1)(B).

### A

■■■ Counts I and II allege that Campbell and Pauls breached the applicable standard of care for medical providers in Virginia by failing to diagnose Lancaster's brain tumor. More specifically, these claims assert that Campbell and Pauls violated the standard of care by failing: (i) to order an MRI, EEG, or other diagnostic test, which would have disclosed Lancaster's tumor; (ii) to refer Lancaster to a neurologist; and (iii) to medicate Lancaster properly. These allegations, distilled to their essence, attack medical decisions concerning treatment, not administrative decisions concerning benefits; they focus on a physician's medical determination concerning appropriate treatment and medication, not on an administrator's decision to deny benefits as a matter of coverage or discretion; they attack the *quality* of treatment afforded Lancaster as a patient, not the *quantity* of benefits provided Lancaster as a plan beneficiary. So viewed and understood, Counts I and II are entirely state malpractice claims that do not trigger or implicate

---

**26.** *Dukes,* 57 F.3d at 358 ("There may well be cases in which the quality of a patient's medical care or the skills of the personnel provided to administer that care will be so low that the treatment received simply will not qualify as health care at all.").

**27.** 28 U.S.C. 1441(c) provides, in pertinent part, that: "Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed...."

§ 502(a)(1)(B) and hence provide no basis for the operation of the complete preemption doctrine.[28]

Nor is this conclusion changed or affected in any way by the mere reference in the two counts to the Incentive Program. Although not explicitly stated, the allegations in the counts permit the inference that plaintiffs claim the Incentive Program caused Campbell and Pauls to refrain from ordering diagnostic tests or a neurology consult. Indeed, plaintiffs' counsel said as much at oral argument and defendants certainly argue that this is the case. Even so, this does not convert these medical malpractice claims into claims for administrative denial of benefits. In Virginia as elsewhere, medical malpractice plaintiffs need only show that a deviation from the standard of medical care occurred; they are not required to show why it occurred.[29] A health care provider's deviation from the standard of care is actionable whether it was occasioned by inadvertence, ignorance, mistake, superstition, or indeed for any reason at all. Yet, this does not mean that it is never appropriate for a plaintiff to show the cause of a negligent medical treatment decision. In this context, for example, it may be relevant for plaintiffs to attempt to show that the Incentive Program induced Campbell and Pauls to refrain from ordering diagnostic tests or a neurological consult for the purpose of rebutting a claim by Campbell and Pauls that their decision was based solely on sound medical consideration.

In sum, the allegations in Counts I and II amount to state medical malpractice claims and nothing more. Because they focus on medical decisions and the quality of the care provided and not on administrative decisions concerning the quantity of services due under a health plan, these allegations afford no basis for removal.

**B**

The first sections of Counts III and IV allege that both Kaiser and the Medical Group, respectively, are vicariously liable for Campbell's and Pauls' purported medical negligence.[30] For the reasons stated in Part A *supra*, these claims of vicarious liability against Kaiser and the Medical Group are malpractice claims that afford no basis for removal under the complete preemption doctrine.

**C**

The second section of Count III and part of Count V, respectively, allege claims against Kaiser for negligently establishing the Incentive Program and for intentionally and knowingly concealing its existence from plaintiffs. Notwithstanding plaintiffs' characterizations to the contrary, the gravamen of these claims is that Kaiser purposefully established and implemented an administrative policy that had the effect of inducing Campbell and Pauls to deny benefits to Lancaster, thereby causing her injuries.

In contrast to the medical malpractice claims of Counts I and II and the vicarious liability claims of Counts III and IV, the direct negligence claim of Count III and the

---

**28.** The absurd consequences of concluding otherwise confirm the correctness of this conclusion. ERISA plans are required to provide a participant or beneficiary written notice of a denial of benefits and an opportunity for a full and fair review of that denial by an appropriate plan fiduciary. § 503, 29 U.S.C. § 1133. The ERISA participant or beneficiary denied benefits under his or her plan can then seek judicial review of that specific administrative denial. *See* § 502(a)(1)(B). Thus, if every instance of negligent treatment by a physician were construed as an administrative denial of a claim for plan benefits, then in every such case the patient would have the right to notice and review with respect to that medical treatment decision, followed by a hearing and judicial review with respect to each "denial" of a plan benefit. ERISA neither contemplates nor requires such an absurd result.

**29.** *See* Virginia Code § 8.01–581.1 *et seq.* ("[T]he standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth....").

**30.** Nothing in this opinion should be taken as intimating any view concerning whether, under Virginia law, Kaiser or the Medical Group may be vicariously liable for the medical decisions of Campbell and Pauls.

fraud claim of Count V attack an administrative decision, not a medical one. Properly construed, these claims focus on Kaiser's administrative decision to curb rising health care costs by employing a system of financial incentives that rewarded physicians for not ordering tests or treatments. In other words, the direct negligence claim of Count III and the fraud claim of Count V challenge an administrative decision that had the effect of denying benefits to Lancaster as a plan participant because it inappropriately influenced Campbell and Pauls to take certain non-medical factors, most notably, their incomes, into account when prescribing treatment. These claims for direct negligence and fraud against Kaiser trigger § 502(a)(1)(B) and support complete preemption since they challenge an administrative decision that has the effect of denying benefits.

No federal decision directly addresses this point.[31] Nevertheless, numerous cases concerning another frequently employed HMO cost containment policy, colloquially known as pre-certification, or utilization, review, buttress the result reached here. As a general rule, pre-certification involves the use of an independent or third-party reviewer who evaluates a physician's medical decisions to determine the necessity and cost-effectiveness of the recommended approach prior to hospitalization or treatment. Courts that have examined this policy have uniformly found that challenges to such pre-certification decisions are either completely preempted under § 502(a)(1)(B)[32] or subject to an ERISA preemption defense under § 514(a).[33] Notwithstanding the paucity of guidance here, it is pellucidly clear that the Incentive Program, like pre-certification review, also affects the quantity of benefits delivered to a beneficiary. Under such a program, an HMO pays bonuses to physicians who refrain from ordering so-called "unnecessary" referrals or "unwarranted" diagnostic tests. Of course, it is easy to see that a policy of this sort could have the effect, depending perhaps on the size of the incentives, of denying

**31.** Recently, however, the Eighth Circuit was presented with a similar question, but did not decide it on the grounds of complete preemption. In *Shea v. Esensten*, 107 F.3d 625 (8th Cir.1997), the Eighth Circuit considered whether ERISA preempted a wrongful death claim against an HMO based on a policy similar to the Incentive Program at issue here. There, plaintiff's husband repeatedly visited his family's primary care doctor complaining of severe chest pains, shortness of breath, dizziness, and muscle tingling. Despite those warning signs and the husband's extensive family history of heart disease, the physician persuaded the husband that his symptoms did not merit an appointment with a cardiologist. Several months after his visits, the husband died of heart failure. Unbeknownst to the decedent, his HMO, Medica, had instituted a financial incentive policy that rewarded its primary care physicians for not referring patients to specialists. Plaintiff, decedent's wife, sued Medica for fraudulent nondisclosure and misrepresentation in Minnesota state court. Medica removed the action to federal court and the district court denied plaintiff's motion to remand. Next, plaintiff amended her complaint to assert a claim that Medica's administrative policy of reducing referrals violated its fiduciary duties under §§ 1002(21) and 1104(a) of ERISA. At this point, the district court dismissed plaintiff's complaint for failure to state a claim.

In reversing the district court's holding regarding Medica's fiduciary duty, the Eighth Circuit also held that § 514(a) superseded plaintiff's state law claims against the financial incentive policy. That ruling is certainly instructive, but ultimately inapposite because it focuses on § 514(a) ERISA preemption, not § 502(a)(1)(B) complete preemption.

**32.** *See, e.g., Jass v. Prudential Health Care Plan Inc.*, 88 F.3d 1482 (7th Cir.1996) (finding that the complete preemption doctrine applied to plaintiff's negligence claim against the pre-certification review administrator who had denied her request for physical therapy to rehabilitate her knee subsequent to surgery).

**33.** *See, e.g., Kuhl v. Lincoln Nat'l Health Plan of Kansas City, Inc.*, 999 F.2d 298, 302 (8th Cir. 1993) (affirming district court's ruling that ERISA preempted plaintiffs' medical malpractice claim against decedent's HMO because defendant's decision to delay pre-certification of heart surgery "cannot be stretched to imply that [defendant] went beyond the administration of benefits and undertook to provide [decedent] with medical advice"), *cert. denied*, 510 U.S. 1045, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994); *Corcoran v. United Healthcare, Inc.*, 965 F.2d 1321, 1332 (5th Cir.) (holding that ERISA preempted plaintiffs' state law claims against the medical review organization that had denied hospitalization during high risk pregnancy because plaintiffs "attempt[ed] to recover for a tort allegedly committed in the course of handling a

benefits to plan participants.[34] To be sure, this Incentive Program containment policy differs from pre-certification review in some respects, but the aim and effect of both are essentially the same: both policies seek to constrain health care costs by denying supposedly unnecessary medical treatment and, thus, both may affect the quantity, as well as the quality, of benefits provided to a patient under a plan.

For the foregoing reasons, the direct negligence claim of Count III and the fraud claim of Count V, insofar as it pertains to Kaiser, fall within the scope of § 502(a)(1)(B) and, thus, provide the basis for complete preemption in the circumstances. Because removal jurisdiction over all of plaintiffs' claims in this action is proper on the basis of portions of Counts III and V, it is unnecessary to examine the applicability of complete preemption to the direct negligence claim of Count IV and the remaining fraud claims of Count V. Thus, plaintiffs' motion to remand must be denied, and this Court must next consider whether, as defendants contend, ERISA preempts plaintiffs' state claims.[35]

## IV

The expansive contours of ERISA preemption are well-established. To ensure federal control and "to eliminate the threat of conflicting or inconsistent state and local regulation of employee benefit plans," [36] Congress enacted a sweeping preemption provision. Specifically, ERISA's preemption provision, § 514(a), prescribes that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." The dispositive question in ERISA preemption analysis is whether a state law claim "relate[s] to" the administration of an ERISA plan. "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." [37] As recently clarified by the Supreme Court, the phrase "relate[s] to" is quite broad but not necessarily unlimited.[38]   In *Travelers*,

---

benefit determination"), *cert. denied*, 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992).

**34.** It is immaterial here whether this effect was intended or unintended; it is enough that the effect occurs and that benefits are denied, for the denial of benefits, alone, is sufficient to trigger § 502(a)(1)(B) complete preemption and removal.

A more subtle point worth noting is that the Incentive Program may have the pernicious effect of lowering the standard of care for reasonably prudent practitioners. If a financial incentive was sufficiently robust so as to induce enough physicians to refrain from ordering MRIs and other diagnostic tests in situations such as the one at bar, this cost containment program would effectively diminish the "objective" benchmark for assessing physician competency. Put another way, the denial of benefits on this basis over time might subtly alter the standard by which to measure whether health care providers have rendered adequate medical care.

**35.** Although complete preemption exists here, it is important to acknowledge the somewhat anomalous result that would have obtained had there been no removal jurisdiction. In that event, a state court would have been responsible for resolving the question whether § 514(a) of ERISA preempts plaintiffs' state law claims. At least one academic commentator has suggested that results of this sort are arguably ironic given that ERISA's preemption provision was specifically designed to provide a federal forum for such questions. *See* Karen A. Jordan, *The Com-*

*plete Preemption Dilemma: A Legal Process Perspective*, 31 WAKE FOREST L.REV. 927 (1996).

**36.** *Pilot Life*, 481 U.S. at 46, 107 S.Ct. at 1552; *see also · Travelers*, 514 U.S. at 657, 115 S.Ct. at 1677 ("The basic thrust of the preemption clause, then, was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans."); *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 2217, 96 L.Ed.2d 1 (1987) (To avoid the administrative burdens that compliance with different federal and state laws would impose on employers, "Congress intended pre-emption to afford employers [and employee benefit plans] the advantages of a uniform set of administrative procedures governed by a single set of regulation").

**37.** *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 829, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988) (quoting *Shaw*, 463 U.S. at 96–97, 103 S.Ct. at 2899–2900).

**38.** The Supreme Court's recent and narrowing interpretation of the scope of ERISA preemption in *Travelers*, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), is particularly instructive. In summarizing and criticizing its own precedent on the subject of ERISA preemption, the Court wrote that:

The governing text of ERISA is clearly expansive. Section 514(a) marks for preemption "all state laws insofar as they ... relate to any employee benefit plan" covered by ERISA, and one might be excused for wondering, at first

the Supreme Court expressly noted three categories of state laws that Congress had intended to preempt: (i) "state laws that mandate[ ] employee benefit structures or their administration;" (ii) "state laws [that] provid[e] alternative enforcement mechanisms;" and (iii) state laws that bind plan administrators to a "particular choice and thus function as a regulation of an ERISA plan itself." [39] As the Fourth Circuit opined: "This pronouncement [of § 514(a) ] is 'clearly expansive' but not limitless." [40] In sum, the task at hand requires the application of these guiding principles to plaintiffs' five counts to determine whether they "relate to any employee benefit plan."

■ First, in regard to Counts I and II, the medical malpractice claims against Campbell and Pauls are not preempted. Indeed, it is now well-accepted that the federal defense of ERISA preemption does not preempt professional malpractice actions.[41] The Fourth Circuit, in *Sweeney* and *Selman,* has made it pellucidly clear that "Congress did not intend to preempt 'traditional state based laws of general applicability [that do not implicate] the relations among traditional ERISA plan entities,' including the princi-

pals, the employer, the plan, the plan fiduciaries, and the beneficiaries." [42] Common law medical malpractice is quintessentially the province of state authority.[43] There is simply no reason to believe that Congress—by enacting a statute designed to protect the interests of workers in their benefit plans— intended to remove the long-standing protection against medical negligence afforded by state malpractice law.[44] Further, medical malpractice claims focus on whether a health care provider deviated from an adequate standard of care, not on the contents or administration of a particular ERISA benefits plan. The existence of the Star Enterprises Employee Benefit Plan is incidental to establishing liability under Counts I and II. Plaintiffs seek compensation for Campbell's and Pauls' purported malpractice and nothing more. Accordingly, defendants' motion to dismiss the claims against Campbell and Pauls for medical malpractice must be denied.

Second, since ERISA does not preempt the medical malpractice claims against Campbell and Pauls, § 514(a) should also not preempt the vicarious liability claims of

blush, whether the words of limitation ("insofar as they ... relate") do much limiting. If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for "really, universally, relations stop nowhere." But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality.
*Id.* at 655, 115 S.Ct. at 1677. *See also District of Columbia v. Greater Washington Bd. Of Trade,* 506 U.S. 125, 130, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992) ("Pre-emption does not occur, however, if the state law has only a 'tenuous, remote, or peripheral' connection with covered plans, as is the case with many laws of general applicability.") (citation omitted).

39. *Travelers,* 514 U.S. at 659, 115 S.Ct. at 1678–79. *See also Golas v. Homeview Inc.,* 106 F.3d 1, 7 (1st Cir.1997); *Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1468–69 (4th Cir.1996).

40. *Selman,* 98 F.3d at 1467.

41. *See, e.g., Selman,* 98 F.3d at 1471 ("We believe that [plaintiff's] malpractice claim against insurance professionals is a 'traditional state-

based law[ ] of general applicability [that does not] implicate the relations among the traditional ERISA plan entities'.") (citation omitted); *Sweeney,* 89 F.3d at 1167 ("We now join this unanimous body of federal law and conclude that [plaintiff's] legal malpractice claim against [defendant] does not fall under ERISA's preemptive umbrella."); *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse,* 879 F.2d 1146, 1153 n. 7 (3d Cir.1989) ("We conclude that ERISA does not generally preempt state professional malpractice actions.").

42. *Selman,* 98 F.3d at 1469 (quoting *Sweeney,* 89 F.3d at 1167).

43. *See Vickers v. Nash General Hosp., Inc.,* 78 F.3d 139, 144–45 (4th Cir.1996) (finding that medical negligence claims are "the province of state malpractice law").

44. *See, e.g., Travelers,* 514 U.S. at 655, 115 S.Ct. at 1676 ("Indeed, in cases like this one, where federal law is said to bar state action in fields of traditional state regulation, ... we have worked on the 'assumption that the historic police powers on the States were not to be superseded by the Federal Act unless that was the clear and manifest purposes of Congress'.") (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67

Counts III and IV against Kaiser and the Medical Group. Obviously, an indirect negligence claim for vicarious liability inescapably "relates to" an employee benefit plan in that it requires at least minor reference to the plan in order to establish an agency relationship.[45] But such reference does not sufficiently implicate the underlying objectives of the ERISA statute.[46] The indirect negligence claims here do not purport to mandate or regulate an employee benefit plan. Instead, the claims are directed at Campbell's and Pauls' alleged negligence and the agency relationship between them and Kaiser and the Medical Group. Thus, the motion to dismiss, insofar as it pertains to the vicarious liability claims of Counts III and IV, should be denied.

■ Third, the direct negligence and fraud claims of Count III and Count V against Kaiser are preempted by ERISA. There can be no other result in light of the ruling here on the applicability of the complete preemption doctrine. Claims completely preempted under § 502(a)(1)(B) are, *a fortiori*, preempted under § 514(a). Thus, these claims must be dismissed as preempted.

■ Finally, it is also plain that ERISA preempts the second section of Count IV, which alleges direct negligence against the Medical Group for promulgating the Incentive Program, as well as the fraud claims of Count V against Campbell, Pauls, and the Medical Group for concealing the cost containment policy's existence. Like the direct negligence and fraud claims against Kaiser, the direct negligence and fraud claims at issue here, at their core, assert that Lancaster was denied benefits by the administrative decision to establish and implement the Incentive Program, a policy that encouraged Campbell and Pauls to limit health care costs. While the state laws on which these claims are based do not necessarily implicate ERISA, the substance of plaintiffs' direct negligence and fraud claims are directly "relate[d] to" the administration and regulation of the Star Enterprises Employee Benefit Plan. Permitting these claims to proceed would undermine the congressional policies that underlie ERISA. Absent preemption, for instance, benefit plans would be subject to conflicting directives from one state to the next concerning the propriety of such financial incentive policies. Further, the terms and conditions of the plan are a critical factor in establishing defendants' liability under these claims. Without the plan, there is no cause of action. Accordingly, the direct negligence claim of Count IV and the remaining fraud claims of Count V are preempted by ERISA and the motion to dismiss must be granted.

## V

In light of the foregoing, this Court elects to exercise its discretion under 28 U.S.C. § 1441(c) to remand the non-preempted claims. As to these claims, it is evident that state law predominates within the meaning of § 1441(c).[47] Accordingly, Counts I and II

S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)) (other citation omitted).

**45.** *See Pomeroy v. Johns Hopkins Medical Serv., Inc.,* 868 F.Supp. 110, 113 (D.Md.1994) ("Any theory based on vicarious liability or ostensible agency would require Plaintiffs to show that they looked to the HMO for medical care and that the HMO held out the supposedly negligent doctor or facility as its employee....").

**46.** *See, e.g., Pacificare of Oklahoma, Inc. v. Burrage,* 59 F.3d 151, 155 (10th Cir.1995) ("We agree with the district court that reference to the plan to resolve the agency issue does not implicate the concerns of ERISA preemption."); *Jackson v. Roseman,* 878 F.Supp. 820, 826 (D.Md. 1995) ("As for a determination of an HMO's vicarious liability, the court correctly opined that reference to the plan, if any, will be necessary only for proving matters of agency, not for wrongful plan administration or of the withholding of promised benefits."); *Haas v. Group Health Plan, Inc.,* 875 F.Supp. 544, 549 (S.D.Ill. 1994) ("The mere fact that a claim requires examination of a plan to resolve a contractual issue does not alone justify preemption."); *Kearney v. U.S. Healthcare, Inc.,* 859 F.Supp. 182, 186 (E.D.Pa.1994) ("That one may refer to the contents of a plan to adduce evidence that it held out a particular person as its employee or agent to help sustain a cause of action does not implicate the concerns underlying the ERISA preemption provision.").

**47.** *See, e.g., Buchner v. Federal Deposit Ins. Corp.,* 981 F.2d 816, 819 (5th Cir.1993) ("[I]f a case is removed from state court on the basis of federal question jurisdiction and that case also includes state law claims, [28 U.S.C.] § 1441(c) allows the

and the vicarious liability claims of Counts III and IV will be remanded to the Circuit Court of Prince William County, Virginia.[48]

An appropriate Order will issue.

district court to decide the entire case or, in its discretion, to remand all matters in which state law predominates."); *Richmond v. American Sys. Corp.*, 792 F.Supp. 449, 455 (E.D.Va.1992) ("[U]nder § 1441(c), before exercising its discretion to remand, a court must determine whether or not state law issues predominate in any or all removed claims.").

48. There, of course, these claims will be governed by Virginia's comprehensive medical malpractice law, which includes a $1 million damages cap. *See* Va.Code § 8.01–581.15. Plaintiffs no doubt crafted craft Count V with an eye on avoiding this cap. The result reached here has the effect of maintaining the integrity of the Virginia malpractice scheme, including the cap.