**Dianne L. SHEA, individually and as trustee for the Heirs of Patrick Joseph Shea, decedent, Appellant,**

**v.**

**Sidney ESENSTEN, et al., Respondent.**

**No. C1–00–366.**

Court of Appeals of Minnesota.

Feb. 6, 2001.

Corey J. Ayling, McGrann Shea Franzen Carnival Straughn & Lamb, Minneapolis, and John R. Schulz, Collins Buckley Sauntry & Haugh, St. Paul, for appellant.

J. Richard Bland, Cecilie Morris Loidolt, Meagher & Geer P.L.L.P., Minneapolis, for respondents.

Considered and decided by HARTEN, Presiding Judge, KLAPHAKE, Judge, and ANDERSON, Judge.

## OPINION

### G. BARRY ANDERSON, Judge

Following the death of her husband, appellant Dianne Shea brought an action against respondents, alleging medical malpractice. Appellant challenges the district court's decision excluding (1) evidence of the managed-care structure in place at respondent clinic and (2) evidence of past professional misconduct by one of the respondent physicians. Appellant also claims the district court abused its discretion by submitting the question of comparative fault to the jury. Because appellant did not show that the offered evidence was relevant to the question of medical malpractice, and because the evidence was prejudicial, we hold that the district court acted within its broad discretion by excluding the evidence. We also hold that the district court properly instructed the jury. Accordingly, we affirm.

## FACTS

Drs. Sidney Esensten and Jeffrey Arenson, respondents, are family-practice physicians who treated the decedent, Patrick Shea, for more than a decade before his death in 1993. Shea had a family history of heart disease. Appellant Dianne Shea, Shea's widow, testified that Shea had chest pain as early as 1991 but she did not know whether the chest pain was reported to his doctors. Dr. Arenson administered an exercise stress test in early 1992; Shea passed. In June 1992, Shea felt chest tightness while on business in Thailand and sought medical treatment. A cardiologist at Bangna General Hospital performed blood tests, an electrocardiogram test, and a stress test. Based on the results of these tests, the Thai cardiologist ruled out a cardiac cause for Shea's symptoms.

After returning from Thailand, Shea sought treatment for continuing chest pain, abdominal pain, and dizziness. According to the medical records and Dr. Esensten's testimony, on July 6, 1992, Shea did not complain of any chest pain or discomfort but reported abdominal problems. Dr. Esensten testified that he spoke to the Thai cardiologist and learned that Shea's electrocardiogram and stress tests completed there were normal. Dr. Esensten saw Shea again on July 8, 1992 to review a stomach X-ray, and again on July 22 and August 10, 1992 to follow up on the effectiveness of medications prescribed to alleviate Shea's stomach pain.

Shea saw Dr. Arenson in August 1992 and again on September 17, 1992. Dr. Arenson testified that during those visits Shea complained of abdominal pain and chest discomfort, and told of his medical treatment in Thailand. Although appellant testified that her husband asked to see a cardiologist, the medical records do not show that Shea asked for a specialist referral. Dr. Arenson testified that, had Shea insisted on seeing a cardiologist, he would have made the referral. Instead, based on his complaints, Shea's doctors referred him to a gastroenterologist. The results of a September 1992 colonoscopy showed nothing out of the ordinary. Drs. Esensten and Arenson concluded that Shea's symptoms were anxiety-related and prescribed sedatives. Dr. Arenson saw Shea again on October 6; Shea complained of the same symptoms but had not taken all the medication prescribed to him. Dr. Arenson diagnosed Shea as suffering from hyperventilation and prescribed a sedative.

Shea did not visit his doctors again until February 1, 1993, when he complained to Dr. Arenson of shortness of breath, dizziness, and heartburn. Dr. Arenson administered an electrocardiogram test; the results were normal. Dr. Arenson prescribed medication to lower Shea's cholesterol. On March 5, 1993, Shea telephoned his wife and told her he was suffering from chest pain. On his way to the clinic, Shea drove past two hospitals. Shea was found dead, slumped over the wheel of his car several blocks from the clinic. The autopsy showed Shea's left anterior descending coronary artery was 80–85% blocked and the right coronary artery was 50–60% blocked. Shea had arteriosclerotic heart disease and suffered sudden cardiac death.

In June 1994, appellant, individually and as trustee for her husband's heirs, commenced a medical-malpractice action against doctors Esensten and Arenson; their employer, Family Medical Clinic (clinic); and Shea's insurer, Medica. The case was removed to and returned from federal district court several times because appellants changed defendants and legal theories. The state medical-malpractice claim was tried to a jury in October 1999. Appellant moved for the admission of managed-care evidence to show Drs. Esensten and Arenson had financial motives that interfered with their treatment of Shea. Appellant sought to introduce evidence to show that managed-care incentives discouraged specialist referrals.

Appellant offered financial evidence to show why Shea had not been referred to a cardiologist. Distilled to its essence, Shea's health-insurance plan included specialist treatment if a referral to the specialist was made by a primary-care doctor. The more specialty referrals made, the less income the referring clinic received. The less income the clinic received, appellant argued, the fewer doctors they could employ, and, thus appellant contended, this contractual arrangement discouraged specialist referrals. As support, appellant pointed to 1988 meeting minutes showing that Dr. Arenson expressed concern about the capitation contract between the clinic and Medica.[1]

Appellant also sought to introduce Dr. Esensten's professional-discipline history for impeachment purposes. Dr. Esensten was professionally disciplined in 1989 for prescribing medication to himself. Dr. Esensten and the Minnesota Board of Medical Examiners entered into a stipulated agreement restricting Dr. Esensten's practice. In 1991, following a period of compliance, the Board removed all conditions on Dr. Esensten's medical license. The district court excluded this proffered evidence on grounds of irrelevance, prejudice, and improper impeachment.

---

1. "[A] health care providing entity is 'capitated' when its compensation arrangement with a network involves the provider's acceptance of material financial risk for the delivery of a predetermined set of services for a specified period of time." Minn.Stat. § 62N.27, subd. 4(1) (2000).

Medical experts who testified on behalf of appellant agreed that Shea should have been referred to a cardiologist. But when asked whether respondent's diagnosis was a fatal mistake, one expert answered, "I don't know. I really don't know." Respondents produced three medical experts who testified that Shea's medical records did not show he suffered from a cardiac condition but rather gastrointestinal problems. Respondent's experts did not think Shea's symptoms should have resulted in a referral to a cardiologist. One expert testified that even had a referral been made, the outcome would not have been any different because a cardiologist would have treated the risk factors of smoking and high cholesterol just as Drs. Esensten and Arenson did. Another expert stated that Shea's death was unpredictable and unpreventable.

The district court's jury instructions included an instruction on comparative fault. The jury returned a unanimous special verdict attributing all fault to Shea and no fault to Drs. Esensten and Arenson. The district court denied appellant's motion for new trial. This appeal followed.

### ISSUES

I. Did the district court abuse its discretion by excluding, as irrelevant, prejudicial, and improper impeachment, evidence of managed-care contracts and prior professional discipline?

II. Did the district court abuse its discretion by instructing the jury on the legal theory of comparative fault?

### ANALYSIS

#### I.

◼ Appellant first argues that the district court abused its discretion by excluding evidence that, if admitted, would have (1) shown the managed-care agreement between Medica and the clinic discouraged Drs. Esensten and Arenson from providing proper care and (2) impeached the physicians' testimony. When reviewing evidentiary rulings, we must determine whether the district court has based the decision on an erroneous view of the law or abused its discretion. *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 45–46 (Minn. 1997).

◼ That a reviewing court disagrees with a district court's ruling and would have reached a different result is not a sufficient basis for reversal. *Williams v. Wadsworth*, 503 N.W.2d 120, 123 (Minn. 1993). To constitute reversible error, an evidentiary ruling must be prejudicial. *Uselman v. Uselman*, 464 N.W.2d 130, 138 (Minn.1990). Before an error in the exclusion of evidence may be grounds for new trial, it must appear that such evidence might reasonably have changed the result of the trial if it had been admitted. *Poppenhagen v. Sornsin Const. Co.*, 300 Minn. 73, 79, 220 N.W.2d 281, 285 (1974).

#### A. Exclusion of Managed–Care Evidence

◼ Appellant sought to admit evidence to prove managed-care contracts affected Shea's medical care. The district court determined that the evidence concerning the contracts and other managed-care evidence was not relevant to the determination of the malpractice claim but was "potentially very prejudicial" and did not constitute proper impeachment evidence. The district court reasoned that the issue of malpractice turned on the medical evidence, not the managed-care contracts.

◼ Relevant evidence is evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn.R.Evid. 401. "Reduced to simple terms, any evidence is relevant which logically tends to prove or disprove a material fact in issue." *Boland v. Morrill*, 270 Minn. 86, 98–99, 132 N.W.2d 711, 719 (1965).

To prove negligence in a malpractice action, a plaintiff must show (1) the applicable standard of care recognized by the medical community as applicable to the defendant's conduct; (2) that the defendant in fact departed from the applicable standard; and (3) that the defendant's departure from the applicable standard was a direct cause of the injury. *Williams*, 503 N.W.2d at 123. A plaintiff must offer expert medical testimony

> both to state the standard of medical care and the treatment recognized by the medical community and to establish that the defendant physician in fact departed from that standard, it being settled that a physician is not responsible for the consequences of an honest mistake or error of judgment in his diagnosis or treatment.

*Silver v. Redleaf*, 292 Minn. 463, 465, 194 N.W.2d 271, 272 (1972) (citation omitted). The elements of malpractice do not require the plaintiff to show a physician's reasons or motivations for departing from acceptable standards. Instead, it is the proof that the physician *in fact* departed from the standard of care that is critical.

Appellant points to *D.A.B. v. Brown*, 570 N.W.2d 168, 171 (Minn.App.1997), to illustrate that managed-care incentives go to the heart of a malpractice claim. But that case involved an illegal kickback scheme, and the doctor involved was required by statute to disclose his financial interests. *Id.* The act of malpractice was the negligent nondisclosure. *Id.* Although evidence of financial incentives may, as in *D.A.B.*, be relevant to a "a doctor's attitude toward treatment of his patients during the same period of time," relevance "hinges on whether the plaintiff can plausibly link the two." *Strauss v. Biggs*, 525 A.2d 992, 999 (Del.1987) (finding evidence of overbilling and overscheduling relevant); *see also Madsen v. Park Nicollet Med. Ctr.*, 419 N.W.2d 511, 515 (Minn.App.1988), *rev'd on other grounds*, 431 N.W.2d 855 (Minn. 1988) (patient's status under managed-care structure excluded where evidence only "marginally relevant" to the question of negligent nondisclosure); *Lancaster v. Kaiser Found. Health Plan of Mid Atlantic States, Inc.*, 958 F.Supp. 1137, 1146 (E.D.Va.1997) (observing, in dictum, the possible relevance of an incentive program that discouraged doctors from ordering diagnostic tests); *Corrigan v. Methodist Hosp.*, 874 F.Supp. 657, 659 (E.D.Pa.1995) (holding evidence of doctor's investment in surgical-screw manufacturing company relevant to negligence in informed-consent case where screws were used in plaintiff patient's surgery).

Unlike cases that involve a duty to disclose an incentive, Minnesota law *expressly provides* that a physician has no duty to disclose capitation contracts to a patient. *See* Minn.Stat. § 147.091, subd. 1(p)(4) (2000).[2] Appellant did not offer evidence that Drs. Esensten and Arenson engaged in overbilling or overscheduling or that they had a financial interest in a company that manufactures a product used in Shea's treatment. Appellant did not offer evidence that the clinic discouraged referrals, apart from the fact that referrals reduce the monies available to the clinic. Appellant did not offer to show that Drs. Esensten and Arenson failed to make necessary specialist referrals of other patients. Shea's doctors did, in fact, refer him to a specialist, though not a cardiologist. Appellant argues that Dr. Arenson voiced his concern about the limitations of the capitation contract during a clinic office meeting in 1988, but appellant fails to connect that concern to Shea's treatment years later.

The logical and inevitable conclusion here is that appellant has failed to plausibly link the managed-care contracts to

---

2. We note that had the legislature believed that capitation contracts would unduly compromise standards of care, the nondisclosure of those contracts could have been included among the extensive list of wrongful acts and nondisclosures that may subject a physician to disciplinary proceedings. *See* Minn.Stat. § 147.091 (2000).

Shea's care. The contracts in this case have no meaningful bearing on the medical standard of care required in Shea's case and do not shed any light on whether Drs. Esensten or Arenson departed from that standard of care. Accordingly, the district court did not abuse its discretion by excluding the evidence as irrelevant.

Even had the threshold requirement of "relevance" been met, relevant evidence may nonetheless be excluded if its probative value is

> substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Minn.R.Evid. 403. This rule requires courts to balance the probative worth of the evidence against its potential for harm.

We view the voluminous evidence on managed care and the respective financial risks born by Medica and the clinic to be the type of evidence that would confuse, mislead, and prejudice a jury. *See Madsen,* 419 N.W.2d at 515 (holding that district court did not abuse discretion by excluding very prejudicial evidence that patient's insurance status meant her hospitalization could have adversely affected her physician's profits); *see also In re Commodore Hotel Fire & Explosion Cases* 324 N.W.2d 245, 249 (Minn.1982) (affirming exclusion of restoration-cost evidence because relevance outweighed by its tendency to confuse the jury). A jury, faced with complex financial evidence, might very well have based its decision on cost-containment issues rather than deciding whether Drs. Esensten and Arenson, in fact, departed from the standard of medical care applicable in Shea's case.

A party may, however, impeach a witness by introducing evidence of bias. Minn.R.Evid. 616. Appellant argues that the outcome of this case turned on the credibility of respondent doctors and appellant; therefore appellant should have been allowed to impeach the doctors with evidence of financial incentives. Evidence of bias, prejudice, or interest of the witness for or against any party is relevant and admissible. Minn.R.Evid. 616 cmt. (stating that a witness's bias, prejudice, or interest is a fact of consequence). Cross-examination of an adverse witness is essential to ensure a fair trial and has been characterized as an "inviolate right." *Klingbeil v. Truesdell,* 256 Minn. 360, 366, 98 N.W.2d 134, 140 (1959).

But a district court's exclusion of particular evidence tending to show bias is not reversible error per se. To constitute error, an evidentiary ruling must be prejudicial. *Uselman,* 464 N.W.2d at 138. Where other evidence, even if presented in a "fragmented fashion," shows an association giving rise to bias, there is no prejudice and no cause for reversal. *Bigay v. Garvey,* 562 N.W.2d 695, 702 (Minn.App. 1997), *rev'd on other grounds,* 575 N.W.2d 107 (Minn.1998).

In this case, the jury knew that Drs. Esensten and Arenson worked for the clinic, and their own interest in the outcome of this malpractice action against them was self-evident. In addition, appellant's claim that the doctors had an incentive to avoid referring Shea to a specialist was undercut by evidence that Shea *was* referred to a specialist-a gastroenterologist. Appellant has not shown that the exclusion of the managed-care evidence resulted in prejudice.

We do not conclude that evidence of the financial arrangements that are the basis of managed health care are never admissible; but in the absence of any plausible link between the financial evidence and the patient's treatment, the district court in this case did not abuse its discretion in excluding the evidence.

*B.  Dr. Esensten's Disciplinary Action*

Appellant argues that the district court abused its discretion by excluding impeachment evidence that Dr. Esensten

was professionally disciplined in 1989 for writing medication prescriptions to himself and asking other physicians to write prescriptions for him in 1986, 1987, and 1988.

Minn.R.Evid. 404(a), 608, and 609 provide that character evidence is not admissible for proving the witness acted in conformity therewith unless the evidence refers to character for truthfulness or untruthfulness. Specific instances of conduct may not be used unless the character of a person is an essential element of a charge, claim, or defense. Minn. R.Evid. 405. There are a few notable exceptions where a prior bad act is admissible to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Minn.R.Evid. 404(b).

The district court excluded the discipline evidence, reasoning that the evidence did not fall within an exception to the general rule that character evidence is not admissible. The district court concluded that Dr. Esensten's actions in 1986–88 were remote and had no bearing on character for truthfulness or untruthfulness.

Appellant argues that Dr. Esensten's professional misconduct undercut his credibility and ability to remember, and ought to have been admitted. We disagree. The district court acted within its discretion by determining that Dr. Esensten's misconduct was too remote, in time and in nature, from the alleged acts of malpractice to fall within the exceptions of Rule 404(b). Appellant's offer of proof does not show how Dr. Esensten's 1986–1988 misconduct affected his ability to remember his treatment of Shea in 1991–1993. Moreover, this court has observed that admission of prior bad acts involving drug use for impeachment purposes is not favored because the prior bad acts do not directly relate to a defendant's truthfulness and honesty. *State v. Norregaard,* 380 N.W.2d 549, 554 (Minn.App.1986), *aff'd as modified,* 384 N.W.2d 449 (Minn.1986); *see also Seelye v. State,* 429 N.W.2d 669, 673 (Minn. App.1988) (testimony as to the truthfulness

or untruthfulness of a witness distinguished from evidence of drug or alcohol use that may affect a witness's ability to perceive or to recall her perceptions). Finally, admitting evidence of Dr. Esensten's professional discipline would have been very prejudicial. We hold the district court acted within its broad discretion by excluding the evidence.

## II.

Appellant next claims that the district court abused its discretion by instructing the jury on the theory of comparative negligence. District courts are allowed considerable latitude in selecting the language of jury instructions, and we will not reverse a decision concerning instructions absent an abuse of discretion. *Alholm v. Wilt,* 394 N.W.2d 488, 490 (Minn. 1986). Generally, a new trial is not warranted if the instructions fairly and correctly state the applicable law. *Alevizos v. Metropolitan Airports Comm'n,* 452 N.W.2d 492, 501 (Minn.App.1990), *review denied* (Minn. May 11, 1990). In addition, a party is entitled to a specific instruction on his or her theory of the case if there is evidence to support the instruction and it is in accordance with applicable law. *Cornfeldt v. Tongen,* 262 N.W.2d 684, 698 (Minn.1977).

The district court instructed the jury that "the law requires that negligence be apportioned among those parties found to be negligent in causing Patrick Shea's death." Special verdict question number five asked, "Was decedent Patrick Shea negligent in respect to his care and treatment." Appellant argues that it is improper to instruct the jury on a theory of comparative negligence in a medical malpractice case because "it defies common sense to blame the patient for the alleged medical-malpractice."

Minnesota courts have long applied principles of comparative fault in medical-malpractice cases. *Sandhofer v. Abbott–Northwestern Hosp.,* 283 N.W.2d

362, 368 (Minn.1979); *Martineau v. Nelson,* 311 Minn. 92, 101–02, 247 N.W.2d 409, 415 (1976), *Rosenthal v. Kolars,* 304 Minn. 378, 381, 231 N.W.2d 285, 286–87 (1975). In comparing negligence, a jury may consider the fault of both the physician and patient. *See Tomfohr v. Mayo Found.,* 450 N.W.2d 121, 123 (Minn.1990) ("Ordinarily, in a death by wrongful act negligence case, any fault attributable to a patient is compared with that attributable to the defendant medical provider .").

In this case, respondents presented evidence that Shea did not follow his doctor's advice to quit smoking, did not take all of his prescribed medication, and knew he was to go immediately to a hospital emergency room if he had radiating chest pains. We hold that the district court did not abuse its discretion by instructing the jury to apportion fault.

## DECISION

Because appellant has not shown a plausible link between purported financial incentives to avoid specialist referrals and the care given the decedent by respondent doctors, the district court did not abuse its discretion by excluding, as irrelevant and prejudicial, evidence of the managed-care contracts between the clinic and health insurer. Nor did the district court abuse its broad discretion by excluding, as irrelevant and prejudicial, evidence of the 1988 disciplinary action concerning one physician. Finally, the district court did not abuse its discretion by submitting the question of comparative negligence to the jury.

**Affirmed.**