DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**HEALTHCARE UNDERWRITERS GROUP, INC.,
AMARNATH VEDERE, M.D.,** and **CARDIOLOGY PARTNERS, P.L.,**
Appellants,

v.

**DEBORAH SANFORD,** as Personal Representative of the
**ESTATE OF GERALD L. SANFORD,** deceased,
Appellee.

Nos. 4D20-2023 and 4D20-2026

[March 30, 2022]

Consolidated appeals from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; James L. Martz, Judge; L.T. Case No. 502016CA0011254.

Mark D. Tinker of Cole, Scott & Kissane, P.A., Tampa, and Adrianna de la Cruz-Munoz of Cole, Scott & Kissane, Plantation, for appellant Healthcare Underwriters Group, Inc.

Mark Hicks and Dinah Stein of Hicks, Porter, Ebenfeld & Stein, P.A., Miami, and Keith J. Puya and Hector R. Buigas of the Law Offices of Keith J. Puya, P.A., Palm Beach Gardens, for appellants Amarnath Vedere, M.D. and Cardiology Partners, P.L.

William Zoeller and Michael Baxter of Schuler, Halvorson, Weisser, Zoeller & Overbeck, P.A., West Palm Beach, and Andrew A. Harris and Grace Mackey Streicher of Harris Appeals, P.A., Palm Beach Gardens, for appellee.

WARNER, J.

Dr. Amarnath Vedere, Cardiology Partners, P.L., and Healthcare Underwriters Group, Inc. (collectively referred to as "Dr. Vedere") appeal a final judgment following a jury verdict in favor of Plaintiff Deborah Sanford, as personal representative of the Estate of Gerald L. Sanford, in a medical malpractice wrongful death suit. Dr. Vedere raises multiple issues: 1) the trial was tainted by the improper inclusion on the verdict form of a former

settling defendant; 2) a new trial is required because of the admission of prejudicial "financial motive" testimony and argument; 3) improper argument regarding the survivor's life expectancy resulted in a grossly excessive award of non-economic damages to decedent's daughter; and 4) the court erred in awarding prejudgment interest on the entire amount of the verdict. We conclude that issues one, two, and four do not merit reversal, but that the closing argument requires a new trial on the issue of the surviving daughter's non-economic damages. We address each issue.

**Facts**

The Estate brought a wrongful death action for medical malpractice against Dr. Vedere and Palm Beach Gardens Medical Center[1] ("PBGMC"), alleging that Dr. Vedere negligently performed a percutaneous coronary intervention (PCI) on the decedent, causing him to go into cardiogenic shock and respiratory arrest, leading to his death a month later. The Estate claimed that PBGMC was responsible for Dr. Vedere's negligence on multiple grounds, including that PBGMC and Dr. Vedere were acting in a joint venture while treating the decedent. PBGMC settled with the Estate and was dismissed by court order prior to trial. The Estate's medical negligence claim against Dr. Vedere proceeded to jury trial.

At trial, evidence revealed that the decedent had heart issues and was seen by a surgeon, who recommended a mitral valve repair. Not wanting surgery, the decedent sought out another cardiologist who concluded that he did not need surgery.

A year later, the decedent sought out the opinion of Dr. Vedere, a board-certified interventional cardiologist, on the mitral valve repair. After several tests, the doctor recommended continued medical therapy.

Nine months later, the decedent returned to Dr. Vedere with complaints of heart palpitations. After conducting several tests, Dr. Vedere recommended performing a right and left diagnostic heart catheterization. That procedure was performed and revealed severe calcified stenosis and narrowing of the left anterior descending artery, the most dominant and important coronary artery. Because of the high risk for heart attack or death, Dr. Vedere recommended a PCI procedure to open the blockage and implant a stent. A PCI is a nonsurgical intervention (going through a hole

---

[1] Palm Beach Gardens Community Hospital, Inc., d/b/a Palm Beach Gardens Medical Center.

2

in the skin) to open the heart arteries and keep them open. Dr. Vedere anticipated it would be a complex procedure due to the calcification and tortuosity of the artery, but he had performed approximately 5,000 PCIs in a twenty-two-year period. Because of the decedent's age, Dr. Vedere told him that medications would not work to lessen the blockage. The decedent agreed to an elective PCI procedure, and it was scheduled for the following week.

The procedure went ahead as scheduled. Dr. Vedere intended to first insert a guide catheter to open the artery and let tools in, and then use an atherectomy device to shave off the plaque inside the artery, before opening the artery with a balloon and placing a stent. During the first hour and a half of the PCI procedure, Dr. Vedere made fourteen insertions, removals, and exchanges of guide catheters and wires in an unsuccessful attempt to use the atherectomy device. After the fourteenth attempt, the decedent's blood pressure suddenly dropped, and he went into cardiogenic shock and respiratory arrest.

The decedent was immediately intubated and stabilized by the code team. Dr. Vedere was then able to insert and inflate a balloon to compress fifty to sixty percent of the blockage, but was unable to deploy a stent due to the calcification. Dr. Vedere called a cardiovascular surgeon, and after conferring with him, resumed the procedure. He then inserted an Impella device (a device that assists with pumping blood in the heart) to stabilize the decedent. Later, the decedent was transported to the ICU where he stayed for several more weeks, remaining intubated and minimally responsive. After his health deteriorated further, his wife and daughter decided to remove him from life-support.

The Estate later filed suit for medical malpractice and wrongful death, claiming the PCI was not medically indicated nor was it properly performed. Dr. Vedere defended contending that the procedure was proper, and that the decedent died of other complications.

During the trial, the Estate's expert, a board-certified cardiologist, testified that the PCI procedure which Dr. Vedere performed was not justified and was below the standard of care, because the decedent was asymptomatic, and his condition was non-life threatening. Specifically, the expert opined that the decedent had no symptoms to improve, and the procedure would not reduce his mortality. According to the Estate's expert, the decedent's palpitations and atrial fibrillation stemmed from his mitral valve problems and not from the coronary blockage, because the decedent did not have symptoms of coronary artery disease.

Dr. Vedere disagreed. He and his expert testified that the PCI procedure was medically indicated. They concluded that the mitral valve did not need to be replaced, and coronary bypass surgery was inappropriate and carried a much higher risk.

As to the standard of care, the Estate's expert testified that he had performed over 2,000 PCI procedures during his career and the greatest number of attempts he had ever made to insert a guide catheter was five. He opined Dr. Vedere may have had trouble inserting the guide catheters because he had failed to notice during the diagnostic heart catheterization that the decedent had an unusual anatomic feature: he had an absent left main artery and instead had "dual ostia," a bifurcation that causes two small openings as opposed to one large opening from a left main artery, which was highly unusual and would make the insertion of the catheter much more difficult. The expert testified that the prudent thing for Dr. Vedere to have done when he was having trouble inserting the guide catheters was to "stop" and "back off" before "do[ing] more harm than good."

Conversely, Dr. Vedere and his expert testified that the decedent had a short, but not absent, left main artery. They also testified that the number of catheters used in the PCI procedure was not below the standard of care, even if the decedent's anatomy made it more challenging and ultimately led to the unsuccessful advancement of the atherectomy device and stent.

As for causation, the Estate's expert testified that the cardiogenic shock and respiratory arrest resulted from Dr. Vedere's use of fourteen catheters, which was excessive under the circumstances and caused an impairment of blood flow. Dr. Vedere and his expert testified that the decedent's coronary artery disease and atrial fibrillation were the cause of death. Dr. Vedere also noted that the sedation was a possible cause.

The Estate advanced a theory that Dr. Vedere's negligent performance stemmed from financial motivation. The Estate contended that Dr. Vedere performed an unnecessary procedure and made multiple attempts to insert the catheters, because he wanted to be able to use a new atherectomy device on the market, called the Diamondback Orbital 360 which was manufactured by a company called CSI. Dr. Vedere admitted he received compensation from CSI to train technologists on how to use the device, but he did not receive compensation for using the device itself. Only a single payment of $2,000 was ever identified.

On the subject of damages, the Estate's expert testified that, had the decedent survived the procedure, his life expectancy would have been ten years. Near the end of trial, the Estate read the mortality tables for decedent (12.9 years), his surviving wife (21.9 years), and his surviving daughter (59.7 years) into evidence. Dr. Vedere objected and moved to strike the testimony as to the survivors on the basis that it misled the jury because recovery for pain and suffering would be limited to their joint life expectancy with the decedent. The court overruled the objection and ruled that Dr. Vedere could clarify any misconceptions during closing argument. But in closing argument, the Estate's counsel argued to the jury, over objection, that the daughter would have a long life expectancy and the jury should consider how much longer she would live and have time to think about the years she lost with her dad.

Prior to trial, the parties drafted a verdict form. After noticing that the Estate's draft included PBGMC in the caption, defense counsel removed it. The parties agreed on the form except for the language in one question, and defense counsel agreed to provide the court with copies of both versions of the form. The court approved the Estate's language for the question on the first day of trial.

On the last day of trial, defense counsel provided the court with the final verdict form during the charge conference. According to the defense, the court alerted them during the Estate's closing argument that there was a numbering problem with the verdict form and that it would be fixed. Following closing arguments and rebuttal, the judge gave the jury instructions and then gave the bailiff the jury verdict forms. Neither party requested to see the forms given to the bailiff. However, after the jury had returned its verdict and was discharged, defense counsel noticed that the verdict form included PBGMC in its caption.

The jury entered a verdict for $4,086,004.46, which included $1,000,000 in non-economic damages for the surviving wife and $2,500,000 in non-economic damages for the surviving daughter.

In his motion for new trial, Dr. Vedere contended that by including PBGMC in the caption, the jury was inadvertently advised of a settling defendant in violation of section 768.041(3), Florida Statutes (2020), and a new trial was required. Neither party nor the trial court could explain how the incorrect verdict form was used. Nevertheless, the trial court ultimately concluded that this error was harmless, as the jury was not misled into believing a settlement took place. The court denied the motion for new trial on all grounds raised, and Dr. Vedere appeals.

**The Verdict Form Containing a Settling Defendant in the Caption**

A trial court's evidentiary rulings and rulings on motions for mistrial and new trial are reviewed for abuse of discretion. *See R.J. Reynolds Tobacco Co. v. Calloway*, 201 So. 3d 753, 759 (Fla. 4th DCA 2016); *Hurtado v. Desouza*, 166 So. 3d 831, 835 (Fla. 4th DCA 2015). A trial court abuses its discretion if its ruling was based on an "erroneous view of the law or on a clearly erroneous assessment of the evidence." *McDuffie v. State*, 970 So. 2d 312, 326 (Fla. 2007) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990)).

In the motion for rehearing and on appeal, Dr. Vedere contends that the trial court committed reversible error by giving the jury a verdict form with former defendant PBGMC in the case caption, in violation of section 768.041(3), Florida Statutes (2020).[2] Section 768.041(3) states that the fact of "a release or covenant not to sue, or that any defendant has been dismissed by order of the court shall not be made known to the jury." *Id.*

In *Holmes v. Area Glass, Inc.*, 117 So. 3d 492 (Fla. 1st DCA 2013), relied on by Dr. Vedere, the court considered the inclusion of a settling defendant in the caption of the verdict form and whether it violated section 768.041(3). The plaintiffs filed a negligence action against Area Glass, Inc., and their insurer, State Farm, over the replacement of a damaged windshield on their car. Before trial, the plaintiffs settled with Area Glass and dismissed it from the lawsuit. In preparation for trial, the parties submitted proposed verdict forms. The plaintiffs' form purposely did not include Area Glass in the caption, while State Farm's did. The court chose to use the verdict form including Area Glass in the caption.

Once the case was tendered to the jury for deliberation, the jury returned the question: "Why is *Area Glass* listed as a defendant on the top of the verdict form?" *Id.* at 494. The plaintiffs asked the court to answer that the only defendant in the case was State Farm. The court instead chose to tell the jury that it could not answer the question and that they should "look to the testimony and the evidence that was presented and draw conclusions from that." *Id.* A few minutes later, the jury returned a

---

[2] While the Estate contends this issue is not preserved for lack of objection, we disagree because of the unusual facts of this case, where the error was not discovered until after the jury deliberated, and a contemporaneous objection could not be made. *See Sayih v. Perlmutter*, 561 So. 2d 309 (Fla. 3d DCA 1990). Dr. Vedere preserved the issue by moving for a new trial. *See id.*

verdict in State Farm's favor. The plaintiffs moved for a new trial based on the caption and stated that Area Glass' absence from the case could only imply that it had settled, which was an inference the jury should not have been encouraged to make. The court denied the motion.

On appeal, although the First District noted that no rule required the caption on the verdict form to be identical to the caption used on all pleadings, the court also concluded that including Area Glass, a settling defendant in the caption, violated section 768.041(3). *Id.* at 495. That error was compounded when the jury asked about the inclusion, and the court simply told the jury to draw its own conclusions from the evidence. The court concluded that the inclusion was harmful. "Given the jury question, and the speed with which the jury returned a verdict after the court's answer, it appears that the caption (and the likely inference that appellants had already recovered from Area Glass) did, in fact, influence the verdict." *Id.* at 495.

Dr. Vedere relies on *Holmes* to argue for a bright-line rule that a case caption of a verdict form containing a settling defendant constitutes reversible error. *Holmes,* however, does not hold that it is per se reversible error. It was error under the facts of the case because the jury's question revealed that the jury itself was influenced by the inclusion of the settling defendant. The First District concluded that because it was apparent that it *did* influence the jury, reversal was required.

In contrast to the jury in *Holmes*, the jury in this case did not ask about the verdict form. In fact, nothing in the record indicates whether or not the jury noticed PBGMC in the caption. Also, unlike in *Holmes*, the trial court here did not invite the jury to draw any inferences from the verdict form.

"[A] violation of section 768.041(3) is subject to a harmless error analysis. Thus, a violation of the statute does not require an automatic mistrial, or a new trial." *Samick Corp. v. Jackson*, 645 So. 2d 1095, 1096 (Fla. 4th DCA 1994) (citations omitted). In *Holmes*, the error influenced the jury. In this case, the trial court reasoned as follows in denying the motion for new trial:

> The issue is that there was not one scintilla of discussion. There was not one scintilla of argument. There was nothing that was raised during this trial that would give rise to an error in discussing a party that had settled. No one in this case argued anything about the medical center. Never did

> they raise it with regard to liability, or settlement, or any issues in it.

The court found that the error was harmless. Most significantly, and unlike in *Holmes*, there is no indication that the jury even noticed the verdict caption. "To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict." *Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1256 (Fla. 2014). The trial court, who was closest to the matter, concluded there was no possibility that this error contributed to the verdict. We agree.

### Financial Motive Evidence and Argument

At trial, the court permitted the Estate's counsel, over vigorous defense objections as to relevance, to question Dr. Vedere on cross-examination and attempt to impeach him with his deposition regarding financial compensation from atherectomy device manufacturer, CSI. The Estate wished to use the testimony "to suggest that [Dr. Vedere] was getting paid to use [the device] and that he's using it and that's his motive for doing an unnecessary procedure and not stopping when he should have."

In overruling the objection, the court noted that the Estate's theory of the case from the beginning was that Dr. Vedere performed an unnecessary procedure not indicated by the symptoms that the patient had. The court found it to be "wholly relevant and consistent" with the Estate's case that the motive for the procedure was monetary gain. The Estate was then allowed to proceed with the questioning. Dr. Vedere denied getting paid by CSI for the devices themselves, but he admitted to income for previously training hospital technicians on their proper use. The Estate was also allowed to impeach the doctor with his deposition in which he testified that he had received compensation "for atherectomy devices." He reiterated that he did not get paid for the device. He did get paid to train the technologists and had received one payment of $2,000.

The Estate's counsel raised financial motive again in closing argument, over Dr. Vedere's objection. Counsel first began to discuss the new device and stated that Dr. Vedere denied being paid for using it. The defense immediately objected to the argument as being irrelevant and lacking a predicate, arguing that the Estate had to show that he was making a profit specifically from performing the procedure on the decedent. The court overruled the objections. The Estate's counsel then argued:

8

So he has a relationship, there's a financial relationship with CSI that [the decedent and his wife] had no idea about. And Dr. Vedere did testify that the device that he was trying to use, never successfully, it was new on the market. That's what he said. But the family knows nothing about that. So when you ask yourself why did he keep going? Was he trying to be a hero? Was he acting in the patient's best interests? Or was he trying to show CSI that he could get this in? You consider that.

In this appeal, Dr. Vedere argues a new trial is independently warranted by plaintiff's inflammatory questioning and arguments regarding a payment made by CSI to Dr. Vedere to train PBGMC technologists to use the device. The Estate responds that the trial court did not abuse its discretion in allowing this line of questioning, because the trial court determined that this evidence was relevant to understanding why Dr. Vedere recommended the procedure and made numerous catheter attempts.

In order to determine whether a doctor breached the standard of care in a medical malpractice action, a defendant doctor's actions are measured against the prevailing professional standard of care as testified to by a qualified medical expert. *Saunders v. Dickens*, 151 So. 3d 434, 441 (Fla. 2014). Evidence offered in support of the element of breach must be relevant in order to be admissible. *See* § 90.402, Fla. Stat. (2020); § 90.401, Fla. Stat. (2020) ("Relevant evidence is evidence tending to prove or disprove a material fact."). Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. § 90.403, Fla. Stat. (2020).

Although the determination of relevancy is within the trial court's discretion, a trial court's discretion in determining the relevancy of evidence is limited by the rules of evidence and applicable case law. *Defilippo v. Curtin*, 255 So. 3d 351, 355 (Fla. 4th DCA 2018). An appellate court will not overturn that decision absent a clear abuse of discretion. *Id.* "A trial court's discretion regarding counsel's improper arguments to the jury is guided by whether the comments and arguments were 'highly prejudicial and inflammatory.'" *Fasani v. Kowalski*, 43 So. 3d 805, 809 (Fla. 3d DCA 2010) (quoting *SDG Dadeland Assocs., Inc. v. Anthony*, 979 So. 2d 997, 1001 (Fla. 3d DCA 2008)).

9

Dr. Vedere contends that evidence of a medical practitioner's potential financial motive is irrelevant in all medical malpractice cases because a doctor's actions are measured objectively as to whether the doctor breached the standard of care. The trial court, however, ruled that such evidence would be relevant to the issue of whether the doctor's recommendation of the PCI procedure was negligent and not consistent with the standard of care, which was hotly debated at trial.

Case law supports the use of financial motive evidence in such circumstances. In *Miller v. Affleck*, 632 So. 2d 79 (Fla. 1st DCA 1993), *disapproved of on other grounds by Brown v. Est. of Stuckey*, 749 So. 2d 490 (Fla. 1999), the only Florida case we could find addressing the issue, the court found that a surgeon's testimony that his income was in part dependent upon the number of surgeries he performed was relevant and admissible in a medical malpractice action where the propriety of the surgery and whether the surgeon deviated from the standard of care were issues in the case. "The doctor's thought process in making this decision is clearly relevant to this issue." *Id* at 81.

Cases from other jurisdictions also allow evidence of financial gain in malpractice suits. For instance, in *Corrigan v. Methodist Hospital*, 874 F. Supp. 657, 659 (E.D. Pa. 1995), the court found that a financial tie between a doctor and a surgical screw manufacturer was relevant in a negligence action against the doctor. In *Shea v. Esensten*, 622 N.W.2d 130, 135–36 (Minn. Ct. App. 2001), although the court found the evidence of financial incentive built into a managed care contract irrelevant, it conceded that evidence of such financial incentive may be relevant where there is a "plausible link" between the financial evidence and the plaintiff's treatment. And in *Lancaster v. Kaiser Foundation Health Plan of Mid-Atlantic States, Inc.*, 958 F. Supp. 1137 (E.D. Va. 1997), also concerning managed care incentives, the court in dicta said:

> [M]edical malpractice plaintiffs need only show that a deviation from the standard of medical care occurred; they are not required to show why it occurred. A health care provider's deviation from the standard of care is actionable whether it was occasioned by inadvertence, ignorance, mistake, superstition, or indeed for any reason at all. Yet, this does not mean that it is never appropriate for a plaintiff to show the cause of a negligent medical treatment decision. In this context, for example, it may be relevant for plaintiffs to attempt to show that the Incentive Program induced [the doctors] to refrain from ordering diagnostic tests or a

10

neurological consult for the purpose of rebutting a claim by [the doctors] that their decision was based solely on sound medical consideration.

*Id.* at 1146 (footnote omitted). *See also Paul R. Sugarman & Valerie A. Yarashus, Admissibility of Managed Care Financial Incentives in Medical Malpractice Cases*, 34 TORT & INS. L.J. 735 (1999).

Applying the law to this case, we conclude that the trial court did not abuse its discretion in admitting the evidence and argument concerning financial arrangements which Dr. Vedere had with the manufacturer of the device. While motive is not an element of a cause of action for malpractice, the trial court did not abuse its discretion in determining motive was relevant under the facts of this case as to the claim of negligence in the doctor's recommendation of the PCI procedure. This evidence also tended to rebut the doctor's claim that his procedure was "based solely on sound medical consideration." *See Lancaster*, 958 F. Supp at 1146. No new trial is warranted on this ground.

**Life Expectancy Evidence and Argument**

As to damages, Dr. Vedere contends that the trial court erred in allowing the survivors' life expectancies into evidence where they extended beyond that of the decedent, as well as arguing to the jury, over objection, that it may consider the considerably longer life of the surviving daughter in awarding damages. We agree that based upon the supreme court's determination that a surviving minor's non-economic damages for the wrongful death of a decedent are awardable from the date of the injury to the time the decedent would normally have expected to die, the court erred in overruling the objection to the closing argument, which we cannot deem harmless beyond a reasonable doubt.

In *BellSouth Telecommunications, Inc. v. Meeks*, 863 So. 2d 287, 292 (Fla. 2003), the court considered whether the wrongful death statute limited non-economic damages for a surviving minor to the period of minority of the child. After reviewing the statute, the court held that a "review of the four parallel subsections granting wrongful death damages to survivors indicates that a minor child's recovery under section 768.21(3) should be measured by the joint life expectancy of the child and the deceased parent." The court's reasoning was based in part on the fact that because "it would be expected that a child would lose his or her parents due to natural causes during the child's lifetime, a child's pain and

suffering damages related to a parent's premature death should be limited by the parent's normal life expectancy." *Id.* at 292.

Despite *Meeks* clear limitation on a minor's pain and suffering damages for the loss of a parent, the Estate's counsel in closing argument invited the jury to consider the surviving daughter's entire life expectancy in determining her entitlement to non-economic damages.

> PLAINTIFF: But she lost [her] dad from age 17 to 27, and a lot of things happened during that time and **she has a long, long life expectancy, where she can think about the decade of things that never will happen**.
>
> DEFENSE: Excuse me, Judge, that's not relevant.
>
> THE COURT: Overruled.
>
> DEFENSE: Expectancy beyond the ten years. Move to strike.
>
> THE COURT: Overruled. I think it was the ten years.
>
> PLAINTIFF: So for Jennie, when you consider and you evaluate a loss of her love, she -- I don't want to suggest that her relationship is more valuable, or -- it's different, but **she's going to live longer** and her -- her relationship is different, and again, I don't want to offend you with a number, I don't want to go too low and give my clients an unfair verdict, so I'm just telling you that this is a suggestion and a suggestion only. You do what you think, using [your] life experience and your understanding of the evidence of that's there but for Jennie I would say I suggest 3 million.

(Emphasis added.) This argument plainly conflicts with *Meeks*. The court erred in overruling counsel's objection and by allowing counsel to suggest to the jury that it should consider the daughter's entire life expectancy in awarding pain and suffering damages to the daughter.

Although the trial court instructed the jury that it may consider the joint life expectancy of the surviving daughter and the decedent, that instruction was given *before* closing argument. Because defense counsel's objection to the improper argument was overruled, the jury could have believed that consideration of daughter's entire life expectancy would be appropriate.

The Estate has not shown that this error was harmless under the *Special* standard. The surviving daughter was awarded greater damages than the surviving spouse, even though their awards should have been similarly limited to their joint life expectancy with the decedent, which was either ten or twelve years. *See Meeks*, 863 So. 2d at 292 ("[B]ecause it would be expected that a child would lose his or her parents due to natural causes during a child's lifetime, a child's pain and suffering damages related to a parent's premature death should be limited by the parent's normal life expectancy.").

Although Dr. Vedere also argues that it was error to admit the mortality tables showing the life expectancy of decedent's wife, we conclude that it was not error to admit the tables as to the surviving spouse, particularly because these tables were not used in closing argument to request greater damages from the jury than *Meeks* authorizes. In *McQueen v. Jersani,* 909 So 2d 491, 496 (Fla. 5th DCA 2005), the court held that some evidence relevant to the joint life expectancies of both the survivor and the decedent is needed to establish damages pursuant to section 768.21(2). The plaintiff in *McQueen* did not introduce mortality tables, but the court found that this was not fatal and that the jury could use the medical evidence regarding the decedent and their own observations of the surviving spouse to establish the joint life expectancy. In this case, the Estate used the mortality tables to provide that evidence. As to the surviving spouse, the evidence was relevant, and on this record we cannot say it was prejudicial.

We thus reverse the award of non-economic damages for the surviving daughter. We agree with the Estate, however, that a new trial should be limited to determining the daughter's non-economic damages. Because it is undisputed that the daughter's life expectancy exceeds the life expectancy of the decedent, in any new trial, the mortality tables should be limited to the life expectancy of the decedent.

**Pre-Judgment Interest**

Prior to filing suit, the Estate offered to arbitrate with Dr. Vedere, pursuant to the voluntary binding process for medical malpractice claims established in Chapter 766 of the Florida Statutes. Dr. Vedere refused. After the verdict, the Estate sought pre-judgment interest, allowed under section 766.209. The parties disagreed as to the date from which pre-judgment interest should be calculated. The Estate argued that it should be calculated from the date of the injury. Dr. Vedere contended that it should be calculated from the date of the verdict for economic damages,

and that pre-judgment interest was not available at all for non-economic damages, in accordance with common law. Noting that the statute was unclear as to which date should apply, the court awarded interest from the date on which the doctor rejected arbitration and awarded $816,689.37 in interest. Dr. Vedere contends that this was error.

A trial court's decision concerning a party's entitlement to prejudgment interest is reviewed de novo. *Sterling Vills. of Palm Beach Lakes Condo. Ass'n v. Lacroze*, 255 So. 3d 870, 872 (Fla. 4th DCA 2018).

"When construing a statute, this Court attempts to give effect to the Legislature's intent, looking first to the actual language used in the statute and its plain meaning." *Trinidad v. Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 439 (Fla. 2013).

Chapter 766 establishes a voluntary binding arbitration process for potential medical malpractice claims. The Legislature set forth its intent in establishing arbitration in section 766.201(2)(b), which states:

> Arbitration shall provide:
>
> 1. Substantial incentives for both claimants and defendants to submit their cases to binding arbitration, thus reducing attorney's fees, litigation costs, and delay.

§ 766.201(2)(b), Fla. Stat. (2020). Section 766.207(7)(k) provides that "[a] defendant who rejects a claimant's offer to arbitrate shall be subject to the provisions of s. 766.209(3)." § 766.207(7)(k), Fla. Stat. (2020). In turn, section 766.209(3)(a) provides that if a defendant refuses a claimant's offer of voluntary binding arbitration:

> The claim shall proceed to trial, and the claimant, upon proving medical negligence, shall be entitled to recover damages subject to the limitations in s. 766.118, prejudgment interest, and reasonable attorney's fees up to 25 percent of the award reduced to present value.

§ 766.209(3)(a), Fla. Stat. (2020).

Because section 766.209(3)(a) does not state when the liability for interest commences or the damages to which it applies, Dr. Vedere contends that we should read common law into the statute. "[W]here a statute is silent, the courts 'fill in the inevitable statutory gaps' by relying

14

on the common law." *Dove v. McCormick*, 698 So. 2d 585, 589 (Fla. 5th DCA 1997).

We do not view the statute as "silent" on the issue. As the incentive of arbitration is to avoid costs and delay, the predicate to the award of prejudgment interest is the rejection of the claimant's offer of arbitration, according to the statute. Once a defendant rejects the arbitration offer, the defendant is subject to the additional costs under section 766.209(3)(a). Therefore, prejudgment interest should run from the time the defendant is subject to the terms of the statute, as the trial court found.

The statute also states that claimant is entitled to recover damages, prejudgment interest, and reasonable attorney's fees. It does not differentiate between the types of damages on which prejudgment interest should apply. Therefore, for purposes of the statute, we conclude that the prejudgment interest must accrue on all damages awarded. To hold otherwise would require us to add words to the statute.

The Legislature's "incentive" to accept arbitration and avoid litigation would make no sense if it merely permitted the same award of prejudgment interest a plaintiff would already be entitled to under common law. In *Graber v. Clarendon National Insurance Co.*, 819 So. 2d 840 (Fla. 4th DCA 2002), we recognized the "long-standing principle" under Florida law that "prejudgment interest is not a penalty," but rather "is an element of compensatory damages" that is "traditionally imposed on liquidated damages." *Id.* at 843. However, we distinguished prejudgment interest under section 766.209 from traditional prejudgment interest on the basis that section 766.209 prejudgment interest "is a statutorily created incentive" that "is not tied to the liquidation of damages." *Id.* In other words, prejudgment interest under the statute is not the same as common law pre-judgment interest.

We accord the statute its plain meaning and agree with the trial court's conclusion that the statute authorizes the assessment of prejudgment interest on all damages from the date the defendant rejects arbitration. Otherwise, we would not effectuate the legislative intent expressed in section 766.201(2)(b) to incentivize arbitration.

**Conclusion**

As set forth in this opinion, we affirm the final judgment, except for the award of non-economic damages to the surviving daughter. On that issue,

we reverse for a new trial. Because of the reversal of the award to the daughter, while we affirm the trial court's method of calculation of prejudgment interest, the present pre-judgment award must be reduced by the award of damages to the surviving daughter, which may be recalculated after a new award is rendered.

*Affirmed in part and reversed in part.*

GROSS and ARTAU, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***